May it please the Court, my name is Chris Brinkley on behalf of Appellant Jordan Eskridge, who suffered severe injuries when he was riding his bicycle through a park. The front wheel, he was going over some speed bumps, the front wheel separated from the front fork and he fell over and suffered liver injuries. Now the front, just so you have a little bit of a background and understand the way this sticks out in front, it has open ends like this and the wheel slides up into it and has a hub and an axle mechanism built into it so that when it slides up into there you have a nut you tighten up on this side and then there's a cam and a lever on the other side and supposedly once you tighten that nut a little bit and lift the lever, everything's going to be on there nice and tight. The reason that's important is because this configuration was originally designed for a bicycle race. They could very quickly take that wheel off and put another one on. But this case isn't about a racing bike. This case is about a Walmart special being ridden by a 13-year-old boy and it's undisputed. The hub was misinstalled onto the front fork. However, Mr. Eskridge didn't know that as he's riding over to the park because he doesn't have any problem with the bicycle on the way. Now, in the district court we brought in an expert engineer and a bicycle expert who's been in the industry for about 35 years that says, you know, this kind of misinstallation that occurred was foreseeable and that the incident could have been prevented. Now the bulk of this appeal I think is addressed in the brief so I want to focus on, or adequately addressed there, I want to focus on two key things. First of all, one issue is that the district judge erred in his interpretation of West Virginia's product liability law in this case. The key question under West Virginia law is, is a product reasonably safe for its intended use or foreseeable misuses? And there are three non-exclusive ways in which a product can be defective. One is by design. The second one, and what happened is in the Morningstar case, which is where all this comes from, the West Virginia Supreme Court used some odd language to describe its other categories of defect. After design defect, which is pretty straightforward, they talk about structural defect, which sounds kind of like design defect, but if you read through the cases what you find out that means is manufacturing defects. And then they talk about use defectiveness. You have to read through the cases to find out when they're talking about use defectiveness they mean labels, warnings, and instructions. So Mr. Eskridge at trial would bring in an expert who says that the bicycle is not reasonably safe. Is this, I felt like I was looking at the case a little bit in a vacuum, was this the only accident? It is not the only accident of its type. There have been others with this particular bicycle, but as the expert that I'm discussing mentioned he's had 550 of these cases. He testified about the fact that the industry has known, the bicycle industry has known since the mid-70s about the potential for misinstallation of this stuff. Are you making an effort to get that in? It's in the record. All that's in the record. Which is going to segue over to the second part of the appeal here in just a moment that I want to focus the court on. So the expert comes in and he testifies and says it's not reasonably safe for its intended use, foreseeable misuses, and here's how it could have been fixed. First of all, instead of having that open-ended front fork, what you do is you close the fork. That way if you do something wrong when you put the wheel on and the hub on, it's not going to drop out, it's just going to stay right there where it is. You change the design. Or if you're absolutely insistent that you're going to use that open-ended design, what you can do is you countersink the face of the fork, you put bigger protuberance on here, and what that means is when you try to slide that quick-release on. Fine, but what's the error that Judge Goodwin committed in your view? Well, he decided that because the expert testified that this was a foreseeable misuse, he focused on the word use, decided it was all use defectiveness, as mentioned in Morningstar, therefore it's all warnings and instructions issues. When in fact the experts talking about two of his three alternatives involved redesigning the product. By definition, if you change the design, you're talking about a design defect, not a warnings issue. And incidentally, his third, the expert's third alternative that he proposed was because these quick-release hubs are unique, they're from a racing background, the ordinary person doesn't understand them, put a label right on them. In fact, that had been done as far back as the mid-80s. What do you, what failure to warn was there? You don't even think that's the question? You think it's a manufacturing defect? No, I don't think it's a manufacturing defect at all. I think it is primarily a design defect in that you could have used the closed fork or you could have redesigned that open fork so that it gives feedback to the user that it's not installed properly. Or as a backup, and this is that engineering hierarchy we all hear about, you can put a warning, if you insist on using a quick-release, you can put a label, warning label, right on the quick-release that says, this is a unique type of hub. You need to read your owner's manual because otherwise it's intuitive. We've all seen these in the stores. You put it on, you tighten things down, you lock it up with the flange and you're done. Was the relevant warning included in the owner's manual? It is in the owner's manual. And how long was the owner's manual? I don't recall for sure. I don't remember exactly. Isn't that rather important because people are more resistant to reading very long? It is, and it is a fairly significant document for a bicycle for a 13-year-old. Well, give me a guesstimate as to how many pages are in the owner's manual. I know it was included as part of one of the briefs. I'm looking here, sections out of page 86. Part of the owner's manual is page 86? There's at least 86 pages in the owner's manual. It's 86? Is this warning in boldface? I believe, I don't remember if it's in boldface or all caps. But the problem is. But it is, I mean, it's highlighted or? It is emphasized in some way. And it's talked about in two or three ways. But as you point out, this is a very lengthy document, particularly for a 13-year-old to be reading. I'm just trying to get my bearings here. I understand. What warning would you have him place on the bicycle itself? Well, as far back as 1980, in the mid-80s, and I think it's 1984. Oh, just give me the warning. This is a special type of quick-release mechanism. You need to read your owner's manual in order to properly understand how to use it. As I mentioned, it was designed for racing bicycles, not for ordinary people. That's not going to be of much help, is it? Well, actually, Shimano has been using it since 1984. So apparently, they at least think it's helpful. Mr. Brinkley, if we find no abuse of discretion in the district court's conclusion that your expert couldn't contribute anything to the warning issue, does that take the warning claim out of the case, the failure to warn claim out of the case, leaving only the design defect claim? It could, but you hit on one of the key points. The trial court concluded everything was warning. I understand that, and I understand your argument. The first point is there's design claims and warning claims. Right. So that's the first part of the claim. By the way, I noticed you used the plural when you refer to the design defect claim. Is there more than one? Well, as I mentioned, what the expert proposed is one thing you can do is just use the closed form. You're just talking about the alternative design. That's correct, or another alternative. But it's a single design defect claim. That's right. What evidence of a design defect did you propose? I thought that the expert was going to testify chiefly as to the fact that warnings in the owner's manual were essentially of no moment because nobody ever read them. But how are you going to create a genuine issue of material fact with respect to the design defect? Because the industry has the evidence, and this came from the corporate representatives as well. They admitted, yeah, we've known for years that people can misinstall these types of hubs. Well, if you go back to Morningstar, Morningstar says you have to design for foreseeable misuse. It was clearly a foreseeable misuse. It had been since the 70s. What about the industry? I'm not interested in the Morningstar thing because I want to get down to a more specific level. Tell me what evidence you have that the industry knew this was problematic and continued to use it, or that a rash of injuries came to the industry's notice. What do you have in the summary judgment record that created a genuine dispute of material fact as to design defect? We had the admissions of the corporate representatives, for starters. Read some of them, Timmy. Just read the one or two that you think are most... I'm sorry, I had not anticipated that question. Well, why would you? The gist of it was that Mr. Bland and Mr. Baldus, on behalf of Pacific Cycle and Walmart, said we know that people can misinstall these hubs. We know that that is a safety issue. We know that... Okay, that's your gloss on it. Now, what are the pages in the joint appendix that those alleged admissions can be found? The district court didn't go through any of this, right? No. Because the district court said it's all just warnings. District court said it's all warnings, said it's all speculative, which incidentally, the expert testified also that I hold all these opinions to a reasonable degree of engineering certainty, which takes it out of the realm of being speculative, and never addressed any of the Daubert issues that were addressed in both response to the motion for summary judgment and the Daubert brief. Now, where does your motion for summary judgment raise the design defect issue? What page of the joint appendix? Just tell me. It's raised throughout the... Just give me some page references as to where your question of design defect is raised. Well, you didn't file a motion, right? I assume Judge Wilkinson's asking you about your response to the motion. Correct. I filed a response to the motion for summary judgment. Right. It's... I mean, beginning with the factual statement of what happened, you can start at appendix page 22, and it goes through 29... There's a question raised to the district court, simply as a matter in opposition to summary judgment, the point that we have a genuine issue, material fact. How does... Just tell me about how that comes before the district court. That's all I want to know. We have an expert... Because if it came before the district court, and the district court didn't deal with it, then we've got a problem. The district court didn't deal with it. But how did it... How was it presented? The defendants came in and made the argument that there was no evidence whatsoever of defect. And we cited, throughout the briefing, in response to that, all of the testimony of the expert, Mr. Green. We cited to the testimony from the corporate representatives, Mr. Bland and Mr. Baldus, where they had talked about it. We talked about Mr. Green's experience, like I said, 550 prior cases like this, and put all of that in. The district court then ignored all of that, and... And ignored the design itself. Absolutely. I mean, for example, I mentioned to the court at the beginning, there's actually photographs of what the design looks like. We put in the deposition testimony and the reports from the expert, where he talks about why this is a defect, and how to fix it. How to change the design two different ways, I mentioned. How to add this additional label to the flange of the quick-release mechanism itself. But I gather your point is that the design could be improved without the need, that would obviate the need for the additional warning. Well, certainly if you change the design to a closed-in fork, then you don't have the quick-release on, and you don't need the additional warning on the quick-release. However, if you're going to stick with the open fork, and use a quick-release, then yes, I think you also need the warning on the quick-release, that in addition to changing the design of that says, you know, hey, look, this particular hub mechanism is, you know, kind of specialized in nature. You need to be conscious and aware of exactly how to use it. Because it is very intuitive when you look at it. And Mr. Eskridge testified about it, and it's contained in the record, where he says, look, I went up and I would turn the nut, and then I'd close the flange, and if the handle opened up, I'd close it. In any of these cases, you say there's a rash of these accidents, have many of them gone to trial? I'm not aware. I know that Mr. Green, the expert, has testified in a very large number of them, and the person that's usually on the other side of them is Mr. Mitchell, who was the expert hired by Pacific Cycle and Wal-Mart in this case. Well, this case didn't go to trial. No, no, no, I mean in the other cases. In prior cases, they have fought both ways, and, you know, sometimes the manufacturer wins some, sometimes the plaintiffs win some. I mean, that's the way it always works. That's vagaries of a jury. But as I mentioned, the other point I wanted to raise was that the argument about Mr. Green's thoughts on warnings being speculative, I believe, I think, he also testified that they were to a reasonable degree of engineering certainty. We went through his qualifications, his background, the fact that he's published a book that's got a chapter on this, all of the work he reviewed, the material he reviewed specifically in relation to this case, the testing he did, the industry's knowledge, his knowledge of the background and how this system came about. He was going to testify not just as to the failure of warnings, but also on the design defect claim? That's correct. And the district court looked at none of that. The district court did not mention any of that in its order. It just said, oh, he said, I think, I believe right here, therefore, that's not good enough. He doesn't have enough data. The court never considered the data we pointed them to in terms of what was done. The court never considered a separately filed Daubert motion, which was fully briefed by both parties that had even more information in it. But yet the court concluded that Mr. Green was, in addition to not having sufficient facts and data, that he was not even qualified to talk about warnings. But that issue didn't even come up until a footnote in the Pacific Cycle and Walmart's summary judgment motion. But even then, it didn't reference Daubert. It didn't reference 702. It was kind of a throwaway comment, hey, we don't think that he's qualified. I didn't file a surreply at that time because you put your arguments in the body. And I knew there was a Daubert motion coming. And I briefed the Daubert motion. So it was all in the record. But again, Judge Goodwin, for whatever reason, never looked at the information presented in the response to the summary judgment motion and never looked at any of the information in the response to the Daubert motion. Why do you say the court didn't look at it? Well, it's not even mentioned in the order. So what you mean is there's no mention of it? There's no mention of it. The only thing that's mentioned in the order is that cherry-picked comment, I think, I believe. Not even why doesn't I believe to a reasonable degree of engineering certainty. Why isn't that good enough? The court never says. The court never addresses any of those facts. And I think maybe my time may be up. The clock looks like it may have stopped on me. All right. Thank you. Let's hear from Ms. Hanley. Ms. Hanley. Is it okay if I begin without the – sorry. May it please the court. My name is Tanya Hanley. I represent Walmart and Pacific Cycle with regard to this matter. On behalf of those defendants, the district court properly granted summary judgment in this matter. And for the following reason, that order should be affirmed. First, the circuit court correctly determined that the plaintiff's designed defect claims were not actually designed defect claims, although they were couched in that manner. They were actually used defect claims. Secondly, the court correctly found that the plaintiff had failed to offer any admissible evidence, which as the court is aware is what the district court – circuit court – district court, I apologize, must look at at the summary judgment stage admissible evidence only. And the plaintiffs had not provided any admissible evidence to support their defective use claim. As you've heard from counsel, the product in this case is essentially a CAM system. Why do you say they weren't designed defect claims? There is the only – the plaintiff's theory is essentially that if any manufacturer knows that their product can be misused, they must design it in a different manner. That's not the law in West Virginia. That's not a design claim. That seems to be an oversimplification. It was to the point, even as is in the record, at the summary judgment argument, the question was posed, is there any sufficient warning whatsoever that could be on this bicycle that could fix that defect claim? No, but we're – I'm trying to – I mean, but it was on the – I'm trying to get you to build on your answer to Judge Wilkins. Yes, but – It doesn't have anything to do with warnings. We're talking now, I think, about design. Design. So you said, in response to Judge Wilkinson, the plaintiff's theory is that any time the manufacturer, seller knows about misuse, they've got to design it a different way. And I said, I think that's an oversimplification. And then you were going to tell us why that's not an oversimplification, I thought. Okay. All right. It doesn't have anything to do with warnings. Okay, yes. Just design. Right. Okay. And the reality is that the evidence adduced in this case is that the bicycle in question, the Quando Quick Release Hub, is not just for racers. Consumers want a bicycle that you can easily remove the wheel, the tire, front tire off of without a tool, and that's the point of the Quando Quick Release Hub. You can remove the tire for storage purposes, to transport it in a vehicle, or just to change the tire if you need to change the tire. That is something that the consumers want. The design modifications that are suggested by the expert, which were alternatives, even though he never said what was actually wrong with this design, he just suggested two alternatives. That's what's done in the complaint, and that's what is also done in his expert opinion. The only reason he said— But it's not mentioned by the district court in the order. That's what I'm confused about. And that's because I think it came around to be that way because of the oral arguments, but also just because of what was submitted. There is no—the only suggestion is you should alternate the design because of misuse. Because this could be misused, so you need to alternate the design. And that is—that's not what the Morningstar cases or what the cases say a design defect is. So you're saying that the green doesn't say that your present design is unreasonably safe and that there's an alternative that makes the vehicle, the bicycle, reasonably safe for consumer use. You're saying that's not in the record? That's correct. He says that if this product is—he says if it is misused, it is unsafe. Well, that's not a design defect as long as— Say that again. I'm sorry. If it is misused— Wait, wait. Here's one thing you need to understand. Sorry. When we start talking, you've got to stop so we can only have one person talking at a time. Yes, sir. Are you saying that his testimony is misuse is what generates responsibility to design it safely? Yes, that's exactly what I'm saying. And there's no—that was never put into question at any point. That's what our motion for summary judgment said as well. And that's why the judge determined, the lower court determined that these were not actually design defect claims. These were a failure to warn claim. Why weren't they just defective design defect claims? I don't understand why if the expert's opinion lacks probative evidence, it somehow now becomes a warning claim rather than a design claim. You can have a failed design claim, right? Yes. So, can you explain that? Essentially, yes. I guess I'm doing an inarticulate job of doing so. But the only argument and evidence put before the lower court was this is a design defect because of misuse. Foreseeable misuse. Yes. Okay. And so, plaintiff says, West Virginia law says that making a product reasonably safe, that duty includes a duty imposed on the manufacturer or seller to anticipate in its design misuse that is foreseeable. That's the claim that's being—do you understand that that's the claim? I understand what he's saying. I disagree with him. All right. What is your statement of West Virginia law in that regard? If you look at Ilofsky v. Mitchell & Tyre Corporation, it says that the general test for design claim is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. Right. Okay. And then we go on to those products that are foreseeably misused by consumers. And so, the question is, what does West Virginia law say about that category of products? Well, that falls into the use category because, as the court said in Morningstar, the use defectiveness covers situations when a product may be safe as designed and manufactured, its intended use. It is completely safe. As expert agrees, everyone agrees, product completely safe if used properly. No question. So, your view is that misuse or reasonably foreseeable misuse is still a use claim? Yes. Under West Virginia law, that is correct. Not a design defect claim? That is correct. A design— So, even if the misuse is reasonably foreseeable, that the way you get at that is with warnings? Yes. And so, those are use claims. I understand the argument. I see. But can a design defect claim nonetheless stand independently of a use claim or reasonably foreseeable misuse claim? And if it can stand independently, was it brought before the district judge in a way that the district judge could reasonably have seen that there was a design defect claim apart from any use claim, that it was just defectively designed? And should the district court have addressed that in his summary judgment ruling? Certainly, a design defect claim may stand alone. However— That's what I'm getting at. Then why wasn't a design defect claim standing alone? Wasn't that brought before the district court? There is no question that the plaintiff in this case raised a design defect claim. And the judge does acknowledge that in his order. However, based on the documents submitted, including the response of the plaintiff to the motion summary judgment and at oral arguments, the court deemed that that was actually a use because of the evidence that was going to be presented and the argument— Okay, but that was made.  In the end of that? In the memorandum opinion, he says—if you could give me one second. I left it at the table. I apologize. He does say that. And he even—it's on page 5 of the memorandum opinion. Okay. Sorry. Does it—just tell me what he says with respect— To the design defect claim. He says that the first two theories are based on the bike's defectiveness, but that he believes that they focus on use defectiveness. And he even goes into the plaintiff's—quoting from the plaintiff's brief explains why he believes them to be use rather than design. And that would be they—the front fork presented a foreseeable risk. And this is quoting the court who's quoting the plaintiff. Okay. And in the event of a reasonably foreseeable improper quick-release hub installation of separation, then cites that to the plaintiff's response brief and moves on to the second defect, which is what Mr. Brinkley was speaking of earlier. The second defect— Design defect? Yes. And he says, however, that he believes that all three theories of defectiveness alleged by Eskridge are based upon failure to warn. So he clarifies—he classifies them, I believe properly under West Virginia law, as use defective claims rather than design defect claims. Well, why—I mean, but is that a little bit broad? Would every use defect claim sort of—I mean, would every design defect claim slide into a use claim? Why wasn't there an independent design defect claim brought up? There was one brought up by the plaintiff. However, there was—the evidence that was presented turned it into a use claim. A design defect claim generally are a design that was, for instance, a refrigerator part that, under so much weight, it busts. And so— Well, but maybe that was misuse because there was too much weight put on it. If that's what— The problem is that you can say every design defect is the consumer's fault. I mean, if you push it too far. If the plaintiff presents the proper evidence and argues a design in favor of a design defect, then the judge won't do that. He's arguing that he presented all kinds of schematic drawings and the like, and that the expert testified to the way the particular product was actually designed. See, there's a murky in-between ground between design defect and product use. And consumers do misuse products. But also, we know in these product liability cases that the manufacturer and designer attempts to attribute every—many instances of wrongdoings that, oh, that's the consumer's fault.  And so, is that at play here? Shouldn't the district court have a chance to address the design defect claim straight up? This is a case where the plaintiff's expert testified that if used properly, this is one of the best systems in use known to engineers. Quote, one of the best clamping systems in the world. And that if used properly, the tire will not come out. The front wheel will not come out. So, it is a case where there was simply no evidence whatsoever of design defect before the court. And instead, based on what was presented in response to our motion for summary judgment, the court deemed, I again believe appropriately, that they were actually making misuse claims rather than design claims. Then why weren't the warnings put on the bicycle itself? Well, and that goes to the misuse argument. And it is important to note first that the plaintiff's expert said nothing critical of the owner's manual, agreed. There was nothing wrong with the owner's manual. The directions in the manual were fine. They were correct. If followed, no problems. Instead, his sole— —in the world. The design is one of the safest in the world. Could you give me the exact JA number for that statement? That is in—yes, because it's in my brief. And that is in his deposition. Where is that deposition statement? Just tell me— Yes, it's appellate pages 60 to 61. Is that in the joint appendix? Yes, sir. I'm sorry. All right. And that's the joint appendix site. It's 60 to 61 where the plaintiff's own expert is saying this design is safe. Yes, sir. In addition, Mr. Green, their expert said— Could you just incorporate this into your answer? Okay, I'm sorry. Hold that thought. Judge, the district court says on page 6 of the order, which is 396, quote, Right. And obviously what the court means there is the misuse of the product. There's no dispute that the product was misused. Right. Everyone admits that. So my question is, and I'm tagging on to Judge Wilkinson's last question, how can the district court say what it says there? That I don't need to reach the issue of foreseeable misuse. I just don't . . . This whole case is about foreseeable misuse. But because the two things that have to . . . Even on a foreseeable misuse, the second prong is even if it's foreseeable, what that brings to you is a duty to properly warn. And so what the judge says is I don't have to decide whether it was foreseeable because I know you properly warned because they have no evidence you didn't properly warn. So your submission is that under West Virginia law, as a matter of law, the only duty on a manufacturer, no matter how profound the foreseeable misuse is, all you've got to do is give an adequate warning. And in this case, the district court found the warnings were adequate, even though there wasn't one on the bike. Exactly. That's what it comes to. That's correct. And you found that because the plaintiff's expert is the only evidence that was brought up as a way to say that the warnings were incorrect. But the expert in so doing . . . Because the plaintiffs don't think this is a warnings case in this respect. They think it's a design defect case. Well, they also alleged a use defect. Yeah. So under their use defect theory, you could properly . . . Yes, they still say the warnings aren't correct. What room does all this leave for design defect claims? Because I continue to be bothered by the fact that every design defect claim can be transmuted into a use claim, a consumer misuse claim. What independent status does a design defect claim still have? It still has, certainly does have, status . . . You know, a design defect claim would be independently viable because every product can be misused. It certainly can. And the cases where West Virginia has continued to look at design defects, and I apologize, I can't point you, as I certainly wish I could at this point, to one, but there have continued to be in West Virginia design defect claims that are based on the design defect, not misuse of the product. Your point is that there's not a genuine issue of material fact on design defect because of the plaintiff's own expert's statement, which is in the summary judgment record, that there are not many cases in which the plaintiff's own expert would be saying that if used properly, this would be a very, very safe product. That doesn't occur by . . . Exactly. Would you further refine your position to say that if there's a clear and adequate warning contained in an 80-page owner's manual, that that would absolve a manufacturer of any liability with regard to potential misuse? Barring evidence in another direction, yes. And in this case, we have . . . And I will say the owner's manual is half of an 8.5 by 11 page, so it's not 84 pages of 8.5 by 11, but it is an adequate and their own expert says properly describes what to do. And the only evidence that he submits is his belief that an owner's manual can't be relied on. For any . . . I mean, he's talking bicycles, so no bicycle manufacturer can rely on their owner's manual. He specifically said in his deposition that no one . . . every manufacturer should . . . I'm talking about as a matter of West Virginia law. Unless, yes, unless evidence . . . unless there's something the jury can be . . . that can be presented to the jury for them to find that there are inadequate warnings. And in this case, there's no evidence to find that there were inadequate warnings. The plaintiff's expert felt that the owner's manual was adequate, and West Virginia case law also supports that a manufacturer should be . . . it's reasonable for a manufacturer to believe his owner's manual will be read. So . . . I apologize, I'm not sure how much time I have left. Would that mean that a . . . I'm sorry. Would an illiterate consumer never have a claim? Never have a failure to warn claim? It may very well be that that's the case. And therefore, under West Virginia law, a use claim. Because every failure to warn claim is a use claim. Yes, every use claim, yes, that is true. Would an illiterate person . . . So illiterate people, out of luck. Not true. Visually impaired people, out of luck. Other language people, out of luck.  Okay. And in fact, in those cases, that will be presented to . . . You didn't have a Spanish warning in the manual. Yes. And that would work. And that could be sufficient for a question to a jury to arise, a question of fact. In this case, we don't have an illiterate, we don't have someone who can't speak English. And would you come in and say, well, there are only nine Spanish-speaking people in West Virginia, and therefore, to sell this bike with this manual in West Virginia, we don't have to do that? If that were the case, I may very well. But I would have a witness, and in reality, we would have not gotten summary judgment granted in that case, under those facts, because the . . . That would already be a question of fact under the label of adequacy. And if you had a particular plaintiff that was Hispanic or illiterate or whatever, the warnings might well be inadequate. But the question, I guess, and I think my colleague's question is a good one. I'm not sure it was presented on these facts with respect to this plaintiff, because he did not appear to contend that if he had read the owner's manual, that he would have failed to understand. That is correct. He did not contend that. In fact . . . I don't know what his level of education was, but it wasn't right. But it might be. I mean, in a future case, it could well be, and perhaps the failure to warn cases, the adequacy does indeed turn on whether somebody was able to comprehend them. And there have been numerous use and design defect claims in West Virginia that have not been disposed of on dispositive motions. But under the facts of this case, that was a proper disposition of this case. I would also address the plaintiff's contention . . . Oh, I'm sorry. Okay, time is up. Thank you very much. I appreciate it. Well, he ceded you the balance of his time. I'm thinking he did not do that. Thank you. Some malfunction of the timing mechanism. It is, Your Honor. I'm sorry. I don't think the digital is working properly, so my apologies. I put a distress call in, but it's not going to help you. Sorry. You didn't misuse it, did you? I don't know. Sorry about that. Frankly. Just very quickly, if you go back and you read the Morningstar decision, what it says is, the intended uses of a product include everything a reasonably prudent person might do with it. And if you go on through the opinion, it says, and it's quoting Prosser on the Law of Torts, a manufacturer is relieved of liability if the product is used in some unusual and unforeseeable way. What that means is, if it's a foreseeable misuse, you have to account for it in designing the product. And there's several ways you can do that. One is you can warn about it. But another way is you can design out the potential misuse. That's where the whole design defect argument comes in in this case. Our expert testified, you can design this bicycle so that it doesn't have the potential for misuse. That's what makes it a design claim. That's hard to do. That would be a big step forward in products, a big leap in products liability law to say that the manufacturer or the designer should not design out every potential misuse. There's no way you can design a product if that's good. I don't disagree at all. I have the good fortune of also being an engineer. There's an engineering hierarchy, and the expert in this case talks about it. And here's what you do. If you can design out a defect, you do that. If you can't design out a defect, you guard against the potential danger. If you can't guard against it, you warn as a last result. The expert in this case gave you two ways to design out the defect and a third way to be able to guard against it. But you hit on something earlier that I think is really important. What the district judge Goodwin did in this case was he seized on the word use or misuse and concluded therefore since the product was being used, it had to be use defectiveness. That's not the definition of use defectiveness. Use defectiveness is strictly related to warnings. Every product has to be used in order for it to present any kind of danger. And so the court I think is right. If you decide that use defectiveness means anytime you are using the product, you have literally wiped away design defects and manufacturing defects. And Judge Wilkinson, I wanted to give you one other thing. You ask about facts in the record in support or in response to the motion for summary judgment. And I mentioned the testimony of the corporate representatives and the expert witness. If you read the appellant's brief, the citations to all of that evidence is on pages 10 through 20 of the appellant's. And then they'll give you all the citations back to the record. There was a lot of evidence introduced in this case. Your opposing counsel is saying that your own expert was actually testifying in the deposition to the fact that if properly used, this would be one of the safest systems imaginable. And you hit on exactly the right part of the quote. If properly used, it is safe. Okay. But what about if not properly used? That's kind of troublesome from your perspective. Not really. People's experts don't always testify in the most helpful way to their client. Well, it's not troublesome because that's if properly used. And according to the West Virginia Supreme Court, you have to design or at least account for, in some way, foreseeable misuse. And the defect – I thought your expert said you shouldn't even be using this. The public shouldn't even be using an open fork system. His statement was that as a general rule, the public has no appreciation whatsoever for how dangerous this particular system is. That's correct. Only if you get past that, that if the decision is made to use an open fork system, then it has to be designed and warned against. Then you get into the warnings issues. That's correct. Is this the – I mean, having heard the fine oral arguments on both sides, I'm wondering if this is the kind of thing we ought to certify, not that we go out of our way to certify questions, but it does appear to me that the two parties here are really focused very narrowly on a fairly specific interpretation of West Virginia law that could be dispositive here, not to the outcome of the case, but to the outcome of the appeal. Because if the appellees are correct, that every misuse claim as a matter of law under West Virginia law becomes a labeling claim, then it seems to me maybe the Supreme Judicial Court of West Virginia could answer that for us. And certainly that could be done. I suspect that what the West Virginia Supreme Court would do is say, we're pretty clear in Morningstar and in the Oloski case that there are three non-exclusive types of defect, design, manufacture, or structural as they call it, and labels, warnings, and instructions, or use as they call it, and it can be any of them. Thank you. Thank you very much.
judges: William B. Traxler, Jr., J. Harvie Wilkinson III, Andre M. Davis